**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KIMBER JUST, Plaintiff, v. EXAMONE WORLD WIDE, INC., Defendant. | Civil No. 3:24-cv-1215 (AWT) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kimber Just filed a six-count complaint against ExamOne World Wide, Inc. ("ExamOne"). The plaintiff brings a claim for sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII") (Count One); a claim for retaliation in violation of Title VII (Count Two); a claim for gender discrimination in violation of Title VII (Count Three); a claim for retaliation in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 ("CFEPA") (Count Four); a claim for gender discrimination in violation of CFEPA (Count Five); and a claim for sexual harassment in violation of CFEPA (Count Six).

Defendant ExamOne moves for summary judgment on all claims. For the reasons below, the defendant's motion for summary judgment is being granted.

## I. FACTUAL BACKGROUND

Defendant ExamOne "provides paramedical exam services to the life insurance industry." Pl.'s Local Rule 56(a)2 Statement in Supp. of Summ. J. (ECF No. 38-2) ("PSF") ¶ 1. ExamOne hired plaintiff Just on or about October 17, 2022 as a Phlebotomy and Customer Service Representative. The "[p]laintiff worked at ExamOne's branch office located in Rocky Hill, Connecticut, and reported to Crystal Lavallee, Branch Manager." Id. ¶ 2. Just "worked at the Rocky Hill facility with several co-workers, including Charity Coelho, Phlebotomy and Customer Service Representative and Group Lead and Karen Lee, Phlebotomy and Customer Service Representative." Id. ¶ 5. "Lee was Plaintiff's co-worker and held the same position as Plaintiff. . . . Lee did not have any supervisory authority over Plaintiff." Id. ¶ 7; Def.'s Ex. 1, Decl. of Crystal Lavallee (ECF No. 35-1) ¶ 9.

"As a Phlebotomy and Customer Service Representative, Plaintiff's job duties included receiving calls from insurance representatives to arrange examinations for clients, dispatching phlebotomists to go to locations to perform examinations, scheduling examinations with applicants, and documenting calls and call activity." PSF ¶ 13. While Just "would occasionally perform paramedical examinations on life insurance applicants," id. ¶ 14, the majority of her workday while employed at ExamOne was spent making or receiving phone calls.

"During Plaintiff's first week of employment with ExamOne, Lavallee conducted her training, including showing her how to clock in and out for the day. . . . After the first week, Lee was assigned to train Plaintiff further." Id. ¶ 8. "During Plaintiff's onboarding at ExamOne, she reviewed policies and received training on different policies and procedures, including ExamOne's Harassment and Company Records policies." Id. ¶ 9. The defendant's Company Records policy provides: "No employee may make false, misleading, artificial, or fictitious entries to the Company's records (including time records)." Def.'s Ex. 4 (ECF No. 35-4) at 3. The policy further states that "[f]or every transaction, supporting documentation and records must fairly and fully describe the actual purpose for the transaction and the transaction amount." Id.

The procedure for customer service representatives making and receiving calls was as follows:

> In order to make calls to applicants, insurance representatives, and other individuals, Phlebotomy and Customer Service Representatives would log into ExamOne's electronic computer system and connect to a headset. . . . The system would show when a Phlebotomy and Customer Service Representative was active or inactive, and busy or available. . . . All of the calls that Phlebotomy and Customer Service Representatives make or receive were logged through ExamOne's system. . . . Each Phlebotomy and Customer Service Representative had a unique telephone extension that was connected to the system. . . . Through the reporting system, ExamOne was able to track the incoming and outgoing calls (including telephone numbers) and the duration of those calls.

PSF ¶ 17.

During her deposition, the plaintiff testified that Lee trained the plaintiff

> that when Plaintiff wanted to take a break, she should call her cell phone. According to Plaintiff, Lee explained that "if the phone rang and [Plaintiff] didn't answer it . . . it would track in the system" so "in order to circumvent that, [Plaintiff] needed to have [her Company] phone unavailable."

Id. ¶ 18. The plaintiff testified that Lee trained the plaintiff on calling her cell phone when she wanted a break during the plaintiff's second week of employment. "Plaintiff testified that what Lee told her about calling her cell phone for breaks was concerning to her, but she continued to engage in this practice nevertheless." Id. ¶ 20; see also Def.'s Ex. 3, Dep. Tr. of Kimber Just (ECF No. 35-3) at 123:3-4 ("It was concerning to you?" "Yes."), 124:11-18 ("Despite the fact that you were concerned about [Coehlo] engaging in this practice, [Lee] engaging in this practice, rather than asking your manager about it, you just continued to go along with it?" . . . "Yes."). On or about November 8, 2022, Lavallee showed Just the proper process for placing herself on a break. Just "understood that calling her own cell phone to make it appear she was busy when she was not [] was misconduct." Id. ¶ 24.

Also on November 8, 2022, Just "emailed Lavallee and requested that Coelho train her on examinations rather than Lee.

Plaintiff stated that '[Lee] has been helpful when it comes to the phones, but [Coelho] has been great making sure I understand the entire process of [performing] the exams and paperwork . . . ." Id. ¶ 25. "As requested by Plaintiff, Coelho started training Plaintiff and showed her how to perform examinations." Id. ¶ 26.

During her deposition, the plaintiff testified that on November 18, 2022, Lee threw in "all the kitchen dishes including personal items" belonging to Just and Coelho, into the trash. See Pl.'s Ex. 1, Dep. Tr. of Kimber Just (ECF No. 38-3) at 143:10-146:20. The plaintiff also testified that during a discussion about the possibility of a company Christmas party, Lee recommended that Just bring alcohol to the party, but Just indicated she was not going to do that. In response, Lee said "Why? Are you a chicken sh-t?" Id. at 174:14-25.

"From November 8th to December 26th, 2022, Plaintiff only saw Lee at the branch office, at most, once a week, and there were certain weeks when she did not interact with Lee at the branch office at all." PSF ¶ 27. However, "[a]fter December 25, 2022, Plaintiff and Lee worked in the office together five days a week." Id. The plaintiff "testified that on January 9, 2023, she saw Lee smoking at her desk and that Plaintiff believed it was marijuana based on Lee's prior statement that she used a marijuana pen." Id. ¶ 28.

The plaintiff testified during her deposition that Lee

"read the e-mails between [the plaintiff] and [Coelho] on [Coelho's] computer one day." Def.'s Ex. 3, Dep. Tr. of Kimber Just at 179:2-4. The plaintiff testified that Lee was verbally aggressive towards her "[b]ecause [Lee] knew that [the plaintiff] had reported [Lee] to [Lavallee] about not wanting to be trained." Id. at 180:17-18. The plaintiff testified further that

> on January 11, 2023, Lee was acting aggressive toward [the plaintiff] and said to Plaintiff, after purportedly reading emails between Plaintiff and Coelho, "You can have your sister attack me all you want." . . . Plaintiff testified that she refused to speak to Lee that day unless management was present. . . . Lee encouraged Plaintiff to call management, so Plaintiff called Lavallee and Lavallee's supervisor, Julie Fitzpatrick, Strategic Operations Manager.

PSF ¶ 29. The plaintiff testified "that while she was explaining Lee's behavior to Lavallee and Fitzpatrick over the phone, Lee stated that Plaintiff was lying and told Lavallee and Fitzpatrick that they hired a witch." Id. ¶ 31. She testified that Lee told her: "You better watch your back, I am going to make your life a living hell." Pl.'s Ex. 1, Dep. Tr. of Kimber Just at 215:18-19. "After the call, Plaintiff claims that Lee called her a 'f-cking c-nt' and a 'b-tch' because she reported her to Lavallee and Fitzpatrick." PSF ¶ 32. "Plaintiff testified that Lee only called her a 'b-tch' and a 'c-nt' one time and it was on January 11, 2023." Id. ¶ 33. "Later in the day on January 11, 2023, Plaintiff spoke on a phone call with Lavallee and

requested that she be permitted to work from home." Id. ¶ 34. Lavallee granted Just's request, and Just worked from home until her employment was terminated. "After January 11, 2023, Plaintiff did not see Lee again and had no further contact with Lee." Id. ¶ 36.

The next day, i.e. January 12, 2023, Just "emailed Fitzpatrick her account of everything that she claimed had happened over the past three months with Lee." Id. ¶ 37; see Def.'s Ex. 9 (ECF No. 35-9) at 2 ("I'm . . . sending my detailed account of the last 3 months. As well as what was said during our conversation on the phone yesterday.").

Also on January 12, 2023, Just "submitted a [complaint] to ExamOne's Human Resources Service Center ('HRSC')." PSF ¶ 41. The content of the complaint was as follows:

> I want this to be a separate account of things I've witnessed while working in the office with Karen Lee. Since starting at Exam One Karen has told me that she smokes Marijuana all day everyday. She has come in every morning smelling of it, she takes a break around 9:30-10am to get coffee from Dunkin Donuts and smoke while she's gone, she comes back smelling of it and she smokes on her lunch break. S[h]e has admitted that she's seen patients while under the influence. She says that she hates her home life and her husband so she needs to be high all the time so she can deal with it. She has also told me that she can falsify her call logs to make it look like she's making calls and that she would show me how to do it. She calls her phone, she calls [Coelho's] cell phone and she takes a record of numbers that are disconnected/ not in service so she can call those.

Def.'s Ex. 10 (ECF No. 35-10) at 2.

On January 17, 2023, Harriett Mallory, an Employee Relations Specialist with ExamOne, started an investigation into Just's complaint. "Mallory interviewed all of the Phlebotomy and Customer Service Representatives that worked at the Rocky Hill location, which included Plaintiff, Lee and Coelho." PSF ¶ 46. In the interview, Just told Mallory what Lee did that Just considered to be threatening and aggressive, about Lee's alleged marijuana use, and about Lee's attempts to convince Just to bring alcohol to a Christmas party. See Def.'s Ex. 12 (ECF No. 35-12) at 6-8. During her interview, Just "stated that Lee had told Plaintiff that Lee falsified her call logs." PSF ¶ 48. Mallory asked Just the following questions and Just gave the following answers:

> Have you ever falsified call logs[?]
>
> No; I did call my phone number so I could go to bathroom. Not to call like what [Lee] was doing. My numbers are from calling numbers based on what I was assigned that day. I would erase disconnected numbers from system or put in 1234567890. I would have a note for any number that was disconnected and/or not in service.
>
> Why would you not note the required status if you went to rest room[?]
>
> [H]onestly I would do what I was told to do. I would call my cellphone in the beginning, but since I started putting myself in break.

Def.'s Ex. 12 at 8. During her interview, Just also stated that Lee called her a "f-cking b-tch" and a "f-cking c-nt," which Lee denied when she was interviewed. Coelho admitted during her

interview that she had called her cell phone rather than placing herself on a break.

In response to the plaintiff's complaint to the HRSC, "Lavallee and Fitzpatrick conducted an audit of all of the Phlebotomy and Customer Service Representatives' call logs." PSF ¶ 54. The audit revealed that during December 2022 and the beginning of January 2023, Just had called her own cell phone at least seven times and called Coelho's cell phone at least twelve times. The audit revealed that "since October 2022, [Lee] called her own cell phone number on 82 different occasions," and that "since October 2022, [Coelho] called her cell phone number on 59 different occasions and called Lee's cell phone on 18 separate occasions." Id. ¶¶ 56, 57. On January 27, 2023, ExamOne fired Just, Lee, and Coelho.

During her deposition, the plaintiff "testified that the only individual who she believes discriminated against her was Lee, not Lavallee, Fitzpatrick or any other employees of ExamOne." Id. ¶ 67; see also Def.'s Ex. 3, Dep. Tr. of Kimber Just at 236:1-5. The plaintiff also "testified that her sexual harassment claim is based on Lee calling her a 'b-tch' and a 'c-nt' and Lee's purported threat that Plaintiff better watch her back, which all occurred on the same day in January, and that her sexual harassment claim is not based on anything else." Id. ¶ 68; see also Def.'s Ex. 3, Dep. Tr. of Kimber Just at

229:18-22.

**II. LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce of Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial

court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See

Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting Celotex, 477 U.S. at 323)). Immaterial factual disputes will not prevent summary judgment.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant . . . and draw all reasonable inferences in [the non-movant's] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990) (alteration in original)). Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (Calabresi, J., dissenting) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Also, the nonmoving party cannot simply rest on the

allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Weinstock, 224 F.3d at 41. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," id., if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (emphasis, quotation marks and citations omitted). "Accordingly, unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A. Sexual Harassment (Counts One and Six)

In Counts One and Six, the plaintiff claims that she was subjected to a hostile work environment because of her sex in violation of Title VII and CFEPA, respectively.

To state a claim for a hostile work environment in violation of Title VII, a plaintiff must show

> that the complained of conduct: (1) "is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2)

> creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's sex." See Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001) (internal citations and punctuation omitted).

Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007). The plaintiff must show "harassment that was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive working environment." Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001). To make this showing, the plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citation omitted). The plaintiff must also show "a sufficient basis for imputing the conduct that created the hostile environment to her employer." Ferris, 277 F.3d at 136.

CFEPA provides, in relevant part, that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . to harass any employee . . . on the basis of sex or gender identity or expression." Conn. Gen. Stat. § 46a-60(b)(8). CFEPA defines "sexual harassment" in relevant part as "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when . . . such conduct has the purpose or effect of substantially interfering with an

individual's work performance or creating an intimidating, hostile or offensive working environment." Id. "We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." Craine v. Trinity Coll., 259 Conn. 625, n.6 (2002); see also Martin v. Town of Westport, 558 F. Supp. 2d 228, 242 (D. Conn. 2008) ("Connecticut courts look to federal law for guidance when analyzing CFEPA hostile work environment claims.").

The defendant contends that

> (1) Plaintiff was not subjected to severe or pervasive sexual harassment sufficient to alter the conditions of her working environment; and (2) even if she was . . . , ExamOne cannot be liable for alleged harassment by Plaintiff's non-supervisory co-worker because it provided a reasonable avenue for complaint, and it took appropriate remedial action to address any concerns Plaintiff raised.

Def. Mem. in Supp. of Summ. J. (ECF No. 34) ("Def. Mem.") at 27.[1]

For the reasons stated below, the defendant is entitled to summary judgment with respect to Counts One and Six.

**1. Objectively Severe or Pervasive**

In determining whether there is a hostile work environment, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of abuse." Alfano, 294 F.3d at 374. In Harris v. Forklift Sys.,

[1] With the exception of citations to deposition and hearing transcripts, the page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

Inc., the Supreme Court explained that while "no single factor is required," relevant circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. 17, 23 (1993). "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," are outside the purview of Title VII. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). While "even a single act can meet the threshold if, by itself, it can and does work a transformation in the plaintiff's workplace," "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano, 294 F.3d at 374 (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks and citation omitted) ("[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.").

The defendant argues that the "[p]laintiff has not provided

evidence of severe or pervasive harassment," because "her sexual harassment claim is based on a single instance in which Lee allegedly called her a 'b-tch' and a 'c-nt' and said that Plaintiff better watch her back, which all occurred on the same day . . . ." Def. Mem. at 28. The court agrees.

The plaintiff maintains that:

> Lee called plaintiff a "b-tch" and a "c-nt". Lee yelled the profane, sexist slurs at the plaintiff and in her face. Lee called plaintiff a witch. Witch is a derogatory term used to demonize women. See Oxford Dictionary https://www.oed.com/dictionary/witch n[.]
>
> Lee threatened the plaintiff. Lee said to the plaintiff: "You better watch your back because I am coming for you." Lee told the plaintiff: "I am going to make your life a living hell."

Pl. Mem. in Opp. of. Summ. J. (ECF No. 38) ("Pl. Mem.") at 11. The plaintiff testified that Lee "was verbally aggressive and she was actually getting in [the plaintiff's] face," stating that Lee "leaned over [the plaintiff's] desk to get in [her] face to yell and scream at" the plaintiff. Def.'s Ex. 3, Dep. Tr. of Kimber Just at 180:7-12.

It does not appear that the plaintiff contends that she has offered evidence of severe or pervasive harassment, but in any event she has not done so. The plaintiff testified that the only person who discriminated against her was Lee, and that no other employee of ExamOne did so. She also testified that she is basing her sexual harassment claim on one incident, namely Lee

calling her a "b-tch" and a "c-nt" and threatening her on January 11, 2023. In any event, the plaintiff never saw Lee after January 11, 2023.

Although a single incident could be extraordinarily severe such that it "can and does work a transformation of the plaintiff's workplace," Alfano, 294 F.3d at 374, the plaintiff has failed to produce evidence that could support a conclusion that the January 11, 2023 incident rose to this level. Here, the plaintiff and Lee had ongoing issues regarding their relationship at work, and none of Lee's conduct over the prior few months could be attributable to sexual harassment. At the time of Lee's comment on January 11, 2023, the plaintiff was on the telephone discussing with Lavallee and Fitzpatrick her complaints about Lee. Lee had read certain emails between the plaintiff and Coelho on Coelho's computer, and then Lee made a comment to the plaintiff. When the plaintiff asked Lee what she was talking about, Lee walked back to her desk. She then returned to the plaintiff's desk and made the comment: "You can have your sister attack me all you want." PSF ¶ 29. While Just was on the call with Lavallee and Fitzpatrick, Lee said "Did you guys know you hired a witch? She is a witch. She put a curse on all of us." Def.'s Ex. 3, Dep. Tr. of Kimber Just at 182:13-15. Lee told the plaintiff that she better watch her back and that Lee would make her life a living hell. After the call, Lee

called Just a "b-tch" and a "c-nt."

The plaintiff has not proffered evidence on which a jury could reasonably find that the single occurrence was extraordinarily severe. Any severity of Lee's conduct "is . . . not severe enough to overcome the element of infrequency." Davis v. Verizon Wireless, 389 F. Supp. 2d 458, 475 (W.D.N.Y. 2005).

"There is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination—for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." Alfano, 294 F.3d at 375. But this is not a case where there are multiple acts of harassment and some are overtly sexual. The only acts proffered by the plaintiff are the statements that the plaintiff is a "witch" and that the plaintiff is a "b-tch" and a "c-nt," which occurred in the context of a heated discussion after Lee read emails between Just and Coelho. These statements cannot support a conclusion that the plaintiff suffered a single incident of sexual harassment that was extraordinarily severe. See Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (being called a "'white [b-itch]' or some variation thereof . . . five times over an approximately five month period" cannot be characterized as severe or pervasive); Beale v. Mount Vernon Police Dept., 895 F. Supp. 2d 576, 589

(S.D.N.Y. 2012) ("courts have regularly concluded that the occasional use of [b-tch] is not severe enough to create a hostile work environment" and collecting cases); Fernandez v. Mac Motors, Inc., 205 Conn. App. 669, 682-83 (2021) (conduct was not sufficiently severe or pervasive where, inter alia, another employee "made jokes in the workplace that were demeaning to female employees"; "used words such as '[b-tch],' 'whore,' and 'trashy' when discussing women with other employees"; and yelled in the plaintiff's face).

The facts here are far removed from those in Howley v. Town of Stratford, where, in a single instance in front of a large group, the plaintiff was subjected to a tirade in which: she was told "to 'shut the [f-ck] up, you [f-cking] whining [c-nt]"; inappropriate remarks were made concerning her menstrual cycle; the speaker "yelled in [the plaintiff's] direction that '[t]here is no [f-cking] way that I will [f-cking] apologize to the [f-cking] [c-nt] down there"; and, when the speaker was confronted "about his behavior, [he] launched into an extended barrage of obscene verbal abuse, including at least one comment to the effect that the reason [the plaintiff] did not make assistant chief was because she did not 'suck [c-ck] good enough and only made lieutenant.'" 217 F.3d 141, 148 (2d Cir. 2000). See also Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70-71 (2d Cir. 2000) (plaintiffs' claims survived summary

judgment where they "were subjected to, or at the very least aware of, a stream of racially offensive comments over the span of two to three months" where at least one comment was physically threatening).

### 2. Imputing Lee's Conduct to ExamOne

Lee was not a supervisor, merely Just's coworker. "If the hostile work environment is created by a coworker, the employer is liable only for its own negligence." Dagenais v. Wal-Mart Stores E., LP, No. 3:23-CV-241 (SVN), 2024 WL 3520395, at *4 (D. Conn. July 23, 2024) (citing Bentley v. AutoZoners, LLC, 935 F.3d 76, 92 (2d Cir. 2019)). For alleged harassment by a coworker rather than someone acting in a supervisory capacity, the plaintiff must prove that "the employer 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir. 1994) (quoting Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 63 (2d Cir. 1992)); see also Dagenais, 2024 WL 3520395, at *4 (quoting Bentley, 935 F.3d at 92) ("To show an employer's negligence, 'a plaintiff must adduce evidence 'that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'") (further citation omitted)). The "reasonableness depends among other things on the

gravity of the harassment alleged." Torres v. Pisano, 116 F.3d 625, 638 (2d Cir. 1997) (cleaned up). "In determining the appropriateness of an employer's response, [courts] look to whether the response was 'immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior.'" Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013) (second and third alterations in original) (quoting Crist v. Focus Homes, Inc., 122 F.3d 1107, 1111 (8th Cir. 1997)).

ExamOne contends that "[e]ven if Plaintiff could show that she was subjected to severe or pervasive sexual harassment . . . ExamOne still cannot be liable because the alleged harasser was a non-supervisory coworker and . . . ExamOne provided Plaintiff with a reasonable avenue for complaint, and it took appropriate remedial action as soon as she complained." Def. Mem. at 31-32. Because there is no genuine issue with respect to this contention, the court agrees.

ExamOne's policy on harassment provides that an employee who feels that their rights under that policy have been violated may register their complaint with their direct supervisor, their supervisor's manager, the director of their department or operational group, the Human Resources Service Center, or via a phone line or online reporting methods. Just testified during

her deposition that she received training on ExamOne's harassment policy. See Def.'s Ex. 3, Dep. Tr. of Kimber Just at 111:12-14 ("Specifically harassment, yes. I am supposed to report it to my supervisor and management.").

The record shows that Just took advantage of these reporting methods. Just was on the phone with Lavallee and Fitzpatrick complaining about Lee when Lee told Lavallee and Fitzpatrick that they had hired a witch. On January 12, 2023, i.e. the next day, Just sent Fitzpatrick an email containing her "detailed account of the last 3 months." Def.'s Ex. 9 at 2. That same day, Just submitted a report to ExamOne's Human Resources Services Center as "a separate account of things [she] witnessed while working in the office with Karen Lee." Def.'s Ex. 10 at 2.

Just maintains that ExamOne's "response to plaintiff's complaint of sex harassment was to (a) investigate the plaintiff; and (b) terminate the plaintiff[,] . . . [which] is not effective and appropriate remedial action." Pl. Mem. at 13.

There is no genuine issue as to the fact that ExamOne took prompt action in response to the plaintiff's complaint. On January 11, 2023, the same day as the incident between Just and Lee, Just "spoke on a phone call with Lavallee and requested that she be permitted to work from home," and her request was granted. PSF ¶ 34. Mallory, who investigated the plaintiff's complaint, interviewed Just on January 17, Lee on January 18,

and Coelho on January 20. The plaintiff had first raised the issue of call logs being falsified when she submitted her report to the HRSC, stating that Lee told the plaintiff that Lee was falsifying call logs and would show the plaintiff how to do it. The plaintiff's report to the HRSC preceded the January 17 interview, and it was during that interview that Mallory asked Just if Just had ever falsified call logs. The plaintiff responded "no" but added that she called her phone number so she could go to the bathroom. This topic was raised only after Mallory had asked the plaintiff about threats from Lee, about Lee smoking marijuana and being under the influence while serving patients, about what Lee did that the plaintiff considered to be "volatile" when Just refused to talk to Lee, about the issue concerning bringing alcohol to a Christmas party, and about similar matters. See Def.'s Ex. 12 at 6-8. When Lee was interviewed, she was asked if she had ever falsified call logs and she said "no." Id. at 4. This topic was brought up with Lee only after Mallory asked Lee about topics that had been the subject of the plaintiff's complaint. See id. at 3-4. Coelho was asked whether there had been discussions about falsifying call logs. This was also only after she was asked about the topics that had been the subject of the plaintiff's complaint about Lee. Thus, during each interview, Mallory addressed the areas that were addressed in the plaintiff's complaint and then,

in addition, inquired about falsification of call logs, which was a point that had also been raised by the plaintiff. Consequently, the plaintiff has failed to create a genuine issue of material fact as to whether ExamOne took appropriate remedial action.

**B. Gender Discrimination (Counts Three and Five)**

In Counts Three and Five, the plaintiff brings claims against ExamOne for gender discrimination in violation of Title VII and CFEPA, respectively.

"Claims of sex-based discrimination under Title VII . . . are analyzed using the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Walsh v. New York City Hous. Auth., 828 F.3d 70, 74-75 (2d Cir. 2016). "First, the plaintiff must establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Weinstock, 224 F.3d at 42. "In employment discrimination cases, the burden of establishing a prima facie case is 'minimal.'" Vuona v. Merrill Lynch & Co., Inc., 919 F. Supp. 2d 359, 371 (S.D.N.Y. 2013) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).

If the plaintiff establishes a prima facie case, "a

> presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action." Legg v. Ulster County, 820 F.3d 67, 73 (2d Cir. 2016). "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." Id. at 73-74.

Lenzi v. Systemax, Inc., 944 F.3d 97, 107-08 (2d Cir. 2019).

Under Connecticut law, it is a prohibited discriminatory practice for an employer "to discharge from employment any individual or to discriminate against any individual . . . in terms, conditions, or privileges of employment because of the individual's . . . sex [or] gender identity or expression." Conn. Gen. Stat. § 46a-60(b)(1). "The analysis of discrimination . . . claims under CFEPA is the same as under Title VII." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 556 (2d Cir. 2010) (citing, Craine, 259 Conn. at 637 n.6).

The defendant contends that the "[p]laintiff fails to establish a prima facie case of discrimination based on her gender because the termination of her employment did not occur under circumstances giving rise to an inference of discrimination." Def. Mem. at 19. The court agrees.

Lavallee and Fitzpatrick made the decision to terminate the plaintiff's employment and also made the decision to terminate the employment of Lee and Coelho. The grounds for termination for each of them was misconduct relating to falsification of

records.

The plaintiff testified that the only individual who discriminated against her was Lee, not Lavallee or Fitzpatrick or any other employee of ExamOne. In addition, "Plaintiff interviewed for the position with Lavallee." PSF ¶ 3. "[T]he so-called 'same actor' rule [is] the established principle that the fact that an employee was hired and fired within a short period by the same person is strong evidence of the absence of discriminatory motive." Posner v. Marcus & Millichap Corp. Real Estate Services, 180 F. Supp. 2d 529, 532 n.10 (S.D.N.Y. 2002) (citing Grady v. Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997), cert. denied, 525 U.S. 936 (1998)).

Also, one month after the defendant terminated the plaintiff's employment, the defendant hired two Phlebotomy and Customer Service Representatives in Rocky Hill who are female, which cuts against an inference of discrimination. See Deabes v. Gen. Nutrition Corp., No. 3:08 CV 372 (WWE), 2010 WL 1331111, at *3 (D. Conn. March 31, 2010), aff'd, 415 Fed. Appx. 334 (2d Cir. 2011) ("It is undisputed that defendant replaced plaintiff with another woman after plaintiff's termination, which weighs heavily against any inference that her termination occurred because of gender discrimination."); Montanile v. National Broadcast Co., 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class

weighs heavily against the inference that she suffered discrimination.”).

In addition, all the people involved in the events at issue are female, i.e. Fitzpatrick, Lavallee, Mallory, Coelho, and Lee. “It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible.” Meyer v. State of New York Office of Mental Health, 174 F. Supp. 3d 673, 687 (E.D.N.Y. 2016), aff’d sub nom. Meyer v. New York State Office of Mental Health, 679 Fed. Appx. 89 (2d Cir. 2017) (citing Allen v. Chanel, Inc., No. 12 Civ. 6758, 2015 WL 3938096, at *5, 2015 U.S. Dist. LEXIS 84255, at *13 (S.D.N.Y. June 26, 2015) (“when the decision-maker is in the same protected class(es) as the plaintiff-employee, courts can draw inferences against discriminatory intent,” and here the decision makers were “all female” just like plaintiff); Palak v. St. Francis Hosp., No. 14-CV-4383, 2015 WL 3682805, at *8, 2015 U.S. Dist. LEXIS 76511, at *20-21 (E.D.N.Y. June 12, 2015) (collecting cases for proposition that it “provides an additional inference against discrimination” “where the person who participated in the allegedly adverse decision is also a member of the same protected class”)).

The plaintiff proffers no evidence that creates a genuine

issue as to whether the circumstances under which the plaintiff's employment was terminated give rise to an inference of discrimination. She merely asserts that "[i]n this case, evidence of sex harassment creates an inference of discriminatory motive." Pl. Mem. at 13. She cites to a number of cases:

> Pitre v. Western Elec. Co., Inc., 843 F.2d 1262, 1270 (10th Cir. 1988) ("Evidence of harassment ... helps create an inference of discrimination in [the employer's] promotion and demotion practices."); E.E.O.C. v. Farmer Bros. Co., 31 F.3d 891, 898 (9th Cir.1994) ("Because hostility against women underlies decisions to discharge or to refuse to hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based employment discrimination."); Clark v. Hess Trucking Co., 879 F. Supp. 524, 532 (W.D.Pa. 1995) (recognizing that "proof of a discriminatory atmosphere may be relevant in proving pretext"); Sweeney v. Trustees of Keene State College, 604 F.2d 106 (1st Cir. 1979) ("evidence of [a general atmosphere of discrimination] may be considered along with any other evidence bearing on motive . . . showing that the defendants' reasons are pretexts"); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 546 (3rd Cir. 1992) ("such evidence [of a discriminatory atmosphere] does tend to add 'color' to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff")[.]

Pl. Mem. at 13-14. But the plaintiff has not proffered any evidence that she worked in an atmosphere that was discriminatory or hostile towards women, nor any evidence of harassment (sexual or otherwise) by anyone who was involved in the decision to terminate her employment.

Therefore, the defendant is entitled to summary judgment with respect to Counts Three and Five.

**C. Retaliation (Counts Two and Four)**

In Counts Two and Four, the plaintiff brings claims for retaliation in violation of Title VII and CFEPA, respectively.

"'Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis.'" Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

> Under the test, "[f]irst, the plaintiff must establish a prima facie case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." Fincher[ v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010)]; see also Tepperwien[ v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011)] (discussing the burden shifting analysis in retaliation context); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (same). If the employer succeeds at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been terminated. See [Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)] (emphasis added) (holding that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 220 (E.D.N.Y. 2014) (footnote omitted).

> Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in [42 U.S.C.] § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

Nassar, 570 U.S. at 360.

"The term 'protected activity' refers to action taken to oppose 'statutorily prohibited discrimination.'" Bento v. City of Milford, 213 F. Supp. 3d 346, 360 (D. Conn. 2016) (quoting Smith v. Johnson, 636 Fed. Appx. 34, 37 (2d Cir. 2016)).

> A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful "so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) (internal quotation marks omitted).

Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). However, "[c]omplaints presenting general allegations of harassment unrelated to protected class do not constitute protected activity under either Title VII or CFEPA." Bento, 213 F. Supp. 3d at 360.

"Requiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 n.5 (2d Cir. 2013). "In the employment discrimination context, this means 'a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's [protected characteristic] was one but-for cause of that decision, that is enough to trigger the law.'" Sanders-Peay v. New York City Dep't of Educ., 2024 WL 5007387, at *4 (E.D.N.Y. Dec. 6, 2024) (alteration in original) (quoting

Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020)).

As relevant here, it is a discriminatory practice in violation of Connecticut law "[f]or any . . . employer . . . to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint." Conn. Gen. Stat. § 46a-60(b)(4). "[T]he motivating factor test, and not the but-for test, remains the applicable causation standard for claims of discrimination under CFEPA." Wallace v. Caring Sols., LLC, 213 Conn. App. 605, 626 (2022).

The defendant contends that the "Plaintiff's retaliation claim fails for the fundamental reason that she did not engage in any protected activity," and that the plaintiff "cannot establish a prima facie case of retaliation because there is no evidence of a causal connection between any alleged protected activity and the termination of her employment." Def. Mem. at 35, 37. The plaintiff asserts that she "complained of sex harassment to the defendant," because "[a]ny reasonable employer being notified that a female employee was complaining about being called a 'c-nt', a 'b-tch', and a witch at work, would conclude that the employee was complaining about sexual harassment." Pl. Mem. at 17.

However, the plaintiff has not proffered evidence, which assessed in the light most favorable to her and with all

reasonable inferences drawn in her favor, could support a conclusion that retaliation was either a but-for cause, under the federal standard, or a motivating factor, under the CFEPA standard, with respect to the termination of her employment. On January 11, 2023, while Just was talking to Lavalle and Fitzpatrick about Lee's behavior, Lee stated that the plaintiff was lying and Lee told Lavallee and Fitzpatrick that they had "hired a witch." PSF ¶ 31. It appears that statement was heard by Lavallee and Fitzpatrick. Just "testified that her sexual harassment claim is based on Lee calling her a 'b-tch' and a 'c-nt' and Lee's purported threat that Plaintiff better watch her back, which all occurred on the same day in January, and that her sexual harassment claim is not based on anything else." Id. ¶ 68. The plaintiff admits that "[a]fter the call, Plaintiff claims that Lee called her a 'f-cking c-nt' and a 'b-tch' because she reported her to Lavallee and Fitzpatrick." Id. ¶ 32. Thus, Lavallee and Fitzpatrick did not hear Lee call the plaintiff a "b-tch" and a "c-nt." The plaintiff's first complaint about a hostile work environment was her January 12, 2023 email to Fitzpatrick. In that email, she refers to the fact that Lee said during the January 11 call, "You ladies hired a witch, she put curses on all of us." Def.'s Ex. 9 at 2. She also stated that Lee "verbally attacked me and made open threats." Id. In addition, she stated: "Yesterday I had enough, I finally

told Crystal about Karen smoking marijuana before work, and during work. I caught her smoking inside the office on Monday. She doesn't like seeing patients because she's high. I will also be making a separate HR complaint to that effect." Id. She stated further, "I don't feel sa[f]e in the office with Karen after she has made open threats to bring me harm." Id. But nowhere in that email does Just refer to the fact that Lee "called her a 'f-cking c-nt' and a 'b-tch.'"

The same day, Just submitted the complaint to the HRSC about Lee's "Misconduct - Unprofessional Conduct (Working under the Influence)." Def.'s Ex. 10 at 2. But nowhere in the complaint does Just refer to the fact that Lee "called her a 'f-cking c-nt' and a 'b-tch.'"

Just only refers to the fact that Lee called her a "f-cking c-nt" and a "b-tch" when she is interviewed by Mallory on January 17, 2023 as part of Mallory's investigation into the complaints by Just. Then, Just reported to Mallory that Lee had used those words only in response to a question from Mallory about what threats had been made against her by Lee, as follows:

> What were the open threats of harm[?]
>
> She waited until GL walked out of the room. She asked "what's your problem with me." I told her that I wasn't going to talk without a witness and that agitated her. She said, "you [f-cking] [b-tch], you [f-cking] "[c-nt]", I'm willing to make your life a [living] hell.

Def.'s Ex. 12 at 7. Thus, Just does not report that Lee called

her these names in the context of complaining about the fact that Lee called her these names. Rather, she includes the fact that Lee called her these names when she is asked to recount the threat that Lee made. Just includes these words because they were part of the threatening statement made by Lee. The substance of Lee's statement is that she was going to "make [Just's] life a [living] hell." Id.

"Complaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language." Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). However, while Just was not required to use any particular words in her complaint to ExamOne, "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." Id.

Here, Just never mentioned sexual harassment, and her statement to Mallory was ambiguous at best. In addition, even assuming arguendo that Just can meet her de minimis burden of establishing a prima facie case based on Lee referring to her as a witch, the fact that she reported that Lee had used the words "b-tch" and "c-nt" in threatening her, and the temporal proximity of her complaints and the interview with Mallory and the termination of her employment, Just has not created a genuine issue with respect to the third step of the burden-

shifting analysis. Given the context in which Just complained of Lee’s use of the words “b-tch” and “c-nt” in threatening her, a reasonable jury could not find that Just’s complaint about Lee’s statement was either a but-for cause or a motivating factor with respect to the termination of her employment.

Therefore, the defendant is entitled to summary judgment with respect to Counts Two and Four.

## IV. CONCLUSION

For the reasons set forth above, Defendant’s Motion for Summary Judgment (ECF No. 33) is hereby GRANTED.

The Clerk shall enter judgment accordingly and close this case.

It is so ordered.

Dated this 27th day of August 2026, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge